**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Leson REED, Defendant–Appellant.**

No. 92–6216.

United States Court of Appeals,
Tenth Circuit.

Aug. 3, 1993.

Frank Michael Ringer, Asst. U.S. Atty. (Joe Heaton, U.S. Atty., Leslie M. Kaestner, Asst. U.S. Atty., Oklahoma City, OK, on the brief), Oklahoma City, OK, for plaintiff-appellee.

Joseph W. Strealy of Schnetzler/Strealy, Oklahoma City, OK, for defendant-appellant.

Before BALDOCK, KELLY, Circuit Judges, and OWEN, District Judge.*

OWEN, District Judge.

Leson Reed appeals from his conviction and sentence as a drug dealer. The evidence at the trial, in essential outline, was as fol-

---

* The Honorable Richard Owen, Senior United States District Court Judge for the Southern District of New York, sitting by designation.

1. On September 3, Williams had negotiated with one Roshawn [Wright] McFarland, at her house, for the purchase of one ounce of cocaine base.

lows. In May or June 1991, Antonio Williams, a confidential informant for the Drug Enforcement Agency in Oklahoma City, Oklahoma attempted to purchase cocaine from Reed at the James Market in Oklahoma City. Reed, who was leaving to attend a funeral in another city, told Williams that Mike Woods could provide him with cocaine. Thereafter, in August, Williams, who already had Woods's pager number written on a "Strictly Neat Body Shop" business card, paged Woods, and met with him at the James Market where Williams bought one ounce of cocaine from Woods for $1000. The Strictly Neat Body Shop was an operating auto body repair shop, but was also, it appears, the base for Reed's narcotics operation.

On September 5, Williams paged Fred Rice, known as "Porky," to get cocaine. On a previous occasion Rice had told him, "Damn, we ain't got no dope. I will be glad when Leson gets back." This time Rice had dope available and they met at the James Market. There Williams introduced undercover Detective Elic Bostic to Rice as "C.T.". Because Rice did not have cocaine with him, he told Williams to follow him to another location. They did, going to the house of Roshawn McFarland. Rice went in the house, and on coming out again told Williams and Bostic to follow him, which they did to the Han–D–Sak parking lot. There Rice gave Williams an ounce of cocaine for $1,100.

On October 2, Williams spoke again with Woods. Thereafter, accompanied by undercover agent Bostic, Williams picked Woods up, and Woods told him to drive to the Strictly Neat Body Shop. Upon arriving, Woods went inside, while Williams and Bostic waited in the car.[1] Reed's and Rice's cars were in front of the shop when they arrived. When Woods came out of the body shop he gave Williams the cocaine in exchange for $2,200.

McFarland, in her white jeep, delivered it later that day in the Han–D–Sak parking lot and Williams paid her $1200. This was not testified to at trial, but was considered as a transaction of Reed's conspiracy at sentencing.

A couple of days later, Williams called Reed to complain that Woods had given him only seven quarter ounces of cocaine although he had paid Woods for eight. Williams' testimony was:

> [Reed] said that he had gave Mike eight and I told him Mike only gave me seven. He said he was going to get at Mike about that, because he knowed what he gave him.

During this conversation Reed gave Williams his mobile phone number so Williams could deal with him directly in future drug transactions; and Rice's pager number.[2]

Thereafter, Williams called Reed on Reed's mobile phone and arranged for the purchase of four ounces of cocaine base.

On October 10, Williams and Bostic drove to the Strictly Neat Body Shop to get the four ounces of cocaine base from Reed. Williams introduced Bostic to Reed as his "home boy, C.T.". Reed then told Williams and Bostic that "Dilos was going to count the [drug] money because he [Reed] wouldn't touch the stuff. Because if the police was around, everything would be legitimate." Reed also told them that someone else was bringing the cocaine—that his "home boy was on his way[.]"

While waiting for the cocaine to arrive, Williams was introduced to Reed's brother, George Mackey, also known as "May–May." Upon the coming in view of one Keith Wayne Dennis, also known as "Ki–Ki", Reed remarked, "[H]ere comes my home boy right now." Dennis took four ounces of cocaine out from under his shirt and Williams handed $4,000 to Reed's brother Mackey, who proceeded to count the money. When it was observed that Mackey was having trouble counting the money, Dennis helped him. When Dennis finished counting the money, Williams took the drugs and put them in the trunk of his car. As Williams and Bostic were about to leave, Reed came over to their car and asked, "[I]s everything cool," to which Williams responded, "Yeah." Williams

also told Reed at this time that he might want to buy drugs from him every Wednesday, to which Reed replied, "Well, it is on the table. Next time you come, you won't have to count the money, you just get the dope and you can leave."

On evidence supporting the foregoing, Appellant Leson Reed was convicted of: (1) conspiring to possess cocaine base with intent to distribute, and to distribute it in violation of 21 U.S.C. § 846; (2) using a telephone in facilitating the knowing and intentional distribution of cocaine base in violation of 21 U.S.C. § 843(b); and (3) distributing 103.7 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1). He was sentenced to a term of 360 months, plus concurrent one and five year terms of supervised release to follow, and the standard mandatory special assessments.

On appeal, Reed raises the following issues: (1) whether there was sufficient evidence to establish a drug conspiracy and to link him to it; (2) whether the District Court erroneously denied his motion to dismiss the count charging him with using a telephone in facilitating the knowing and intentional distribution of drugs; (3) whether the District Court erroneously denied his motion for a new trial by reason of the government's alleged failure to comply with a discovery order; and (4) whether the District Court imposed an excessive sentence under the Sentencing Guidelines.

### The Conspiracy Count

■ Count 1 of the Indictment alleged that a drug conspiracy existed between Leson Reed, George Mackey, Fred Rice, Keith Wayne Dennis, and Michael Woods. Reed contends that the evidence presented at trial was insufficient to establish a drug conspiracy and link him to it.[3] The law, well-established, is as we stated in *United States v. Horn*, 946 F.2d 738 (10th Cir.1991):

---

2. Williams, as noted, already possessed Rice's pager number.

3. In reviewing the sufficiency of the evidence, "We view the entire record in the light most favorable to the Government to determine wheth-

er the evidence, together with all reasonable inferences to be drawn therefrom, is such that the jury could find the defendant[ ] guilty beyond a reasonable doubt." *United States v. Gomez*, 810 F.2d 947, 959 (10th Cir.1987).

The essence of a drug distribution conspiracy is an agreement between two or more persons to traffic in controlled substances.

\* \* \* \* \* \*

A conspiracy conviction requires the government to [have] prove[n] that "(1) a conspiracy existed, (2) the defendant knew the essential objectives of the conspiracy, and (3) the defendant knowingly and voluntarily became a part of it."

*Id.* at 740 (quoting *United States v. Esparsen,* 930 F.2d 1461, 1471 (10th Cir.1991)) (citation omitted).

The following essential facts dispose of Reed's contention that there was no conspiracy of which he was a member: (1) Reed's base of operations was the Strictly Neat Body Shop; (2) When Reed was approached by Williams in May or June of 1991 to purchase drugs, Reed told him to get in touch with Woods; (3) in August, Woods, who had previously given Williams his pager number on a Strictly Neat Body Shop business card, sold one ounce of cocaine to Williams; (4) Rice complained to Williams that he had no drugs because Reed was away; (5) Rice later sold cocaine to Williams; (6) Woods sold cocaine to Williams at the Strictly Neat Body Shop on October 2; (7) Reed's and Rice's cars were located in front of the Strictly Neat Body Shop while that transaction was going on; (8) after being shorted one quarter ounce of cocaine by Woods during that transaction, Williams complained to Reed, who said that he would take care of the shortage; (9) Reed gave Williams Rice's pager number; (10) on October 10, 1991 Williams went to the body shop to get cocaine from Reed. It was brought to the body shop by Dennis and delivered to Williams; and (11) Reed and Williams arranged for future deliveries every Wednesday.

Based on the foregoing, it was clearly reasonable for the jury to conclude that there was a conspiracy as charged and that Reed was its main coconspirator.[4]

*Use of a Telephone to Facilitate a Drug Transaction*

■ Count 10 of the indictment charged Reed with using a telephone "on or about October 3" to facilitate the commission of a drug felony in violation of 21 U.S.C. § 843(b). Reed claims that the government failed to prove that the telephone calls "on or about October 3" resulted in an actual distribution of cocaine which, he asserts, is required to convict under § 843(b). Accordingly, Reed contends that the District Court was in error in denying his motion for dismissal or judgment of acquittal as to Count 10.

However, as the Third Circuit has stated in dealing with this issue:

> Section 843(b) makes criminal the use of a telephone "in committing, or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter [subchapter I] or subchapter II of this chapter [Chapter 13 of Title 21]." Included within subchapter I is § 846, which makes it a felony for a person to *attempt* or *conspire* to commit any offense defined in subchapter I (such as distribution or possession with intent to distribute, defined as offenses in § 841). In other words, *attempt to distribute* a controlled substance, *conspiracy to distribute* a controlled substance, *attempt to possess* a controlled substance with intent to distribute it, and *conspiracy to possess* a controlled substance with intent to distribute it, are all felonies under provisions of subchapter I. As such, they are plainly included within the terms of § 843(b).
>
> In sum, we hold that proof of an underlying inchoate crime, such as attempt or conspiracy under § 846, is sufficient to sustain a facilitation conviction under § 843(b). It is therefore not necessary that an actual, consummated distribution be shown. In reaching this result, we are in accord with all other courts of appeals which have considered this question.

*United States v. Pierorazio,* 578 F.2d 48, 51 (3d Cir.) (emphasis in original), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652

---

**4.** As the evidence was sufficient to prove a conspiracy and Reed's involvement in that conspiracy, Reed's argument that it was error for the court to admit coconspirator hearsay statements under Federal Rule of Evidence 801(d)(2)(E) fails.

(1978) (citations omitted). *Accord United States v. Briscoe,* 896 F.2d 1476, 1510 (7th Cir.1990). We agree. Having concluded that Reed's conviction on the conspiracy was proper, the government did not need to prove that the phone calls "on or about October 3rd, 1991" facilitated an "actual distribution" of cocaine base, although it appears on this record that one did in fact facilitate an actual distribution of cocaine base.

Accordingly, the District Court properly denied Reed's motion for dismissal or a judgment of acquittal as to Count 10.

### Failure to Comply with the Court's Discovery Order

■ Prior to trial, the government was to provide Reed with any statements made by him, written or oral.[5] An oral statement came out on the direct examination of undercover agent Michael Bakios as follows:

Q. Did [Reed] make any statements to you?

A. [Reed] had made a statement about Lee Arthur Tucker that—or "Rocky" is the name that he used, that they were enemies. As a matter of·fact, Leson stated that he had hit him in the mouth, I think it was, a week ago, a week prior to November 6th. He said he hit Rocky in the mouth.

Reed contends that not having been told by the agent of this statement of his to the agent, his counsel repeatedly explored a line of inquiry endeavoring to establish, or at least suggest, that it was actually Lee Tucker who was on the phone calls at the body shop and was the one involved in the actual distribution of cocaine. This line of attack, Reed asserts, was undercut by the disclosure later in the trial of his statement concerning his punching Tucker, making it unlikely that Tucker would have been around the body shop at all to take phone calls.

Agent Bakios, upon later inquiry, conceded he had not told Reed's counsel all the details of his conversation with Reed:

Q. And is there a particular reason why you have never brought [the discussion about Lee Arthur Tucker] to the attention of the Court in the preliminary hearing or any other report?

A. I honestly didn't think it was going to become an issue at all until you brought the name Lee Arthur Tucker out.

Q. Is that why, when you testified at preliminary hearing on January 23, 1992, Page 16, you indicated as—or my question to you was "As supplemental information from this affidavit from the undercover report, what additional information has come to your attention since you signed the affidavit?"

You indicated, "Just further details."

A. Uh-huh.

Q. I indicate, "Nothing more than what you testified as of today?"

"Right."

So, in fact, you were not telling us the whole story at the preliminary hearing?

A. No. I was telling you—I don't know whether you expected me to give you everything that Leson Reed had stated to me. I tried to remember the pertinent facts. For instance, Reed stated that he wasn't involved in narcotics trafficking. I thought you would want to know that. The Lee Arthur Tucker bit, to me, was insignificant until trial.

In *United States v. Peveto,* 881 F.2d 844 (10th Cir.1989), we set forth the factors applicable here:

> The Federal Rules of Criminal Procedure give trial courts broad discretion in imposing sanctions on a party who fails to comply with a discovery order.
>
> If any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

\* \* \* \* \* \*

---

**5.** That this was pursuant to some order of the District Court seems clear, and was assumed by the parties before us. Its exact form is, however, not contained in the record.

(citations omitted). The district court's exercise of discretion is governed by several factors:

> When the government fails to comply with a discovery order, the factors the district court should consider in determining if a sanction is appropriate are (1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance. *United States v. Euceda–Hernandez,* 768 F.2d 1307, 1312 (11th Cir.1985); *United States v. Fernandez,* 780 F.2d 1573, 1576 (11th Cir. 1986); *United States v. Wicker,* 848 F.2d 1059, 1061 (10th Cir.1988).

Applying those factors here, it is clear on this record that while Reed's counsel at trial sought a few times to elicit facts supporting a contention that it was Tucker and not Reed at the body shop, counsel's efforts never bore the slightest fruit. As to confidential informant Williams, an example of the cross examination in this area went as follows:

Q. (By Mr. Strealy) The question was: You are not sure that was Leson Reed that answered the telephone?

A. He never answered the phone. Someone called him to the phone.

Q. Someone called someone to the phone?

A. Someone called somebody by the name of Lee to the phone.

Q. Do you know Lee Arthur Tucker?

A. Yes, I do.

 \* \* \* \* \* \*

Q. How many times have you talked to Lee Arthur Tucker on the phone?

A. I haven't.

As to the other participant, Bostic, the cross examination was:

Q. Have you ever met [Lee Tucker]?

A. No, sir, I haven't.

Q. You wouldn't recognize him, then, if he was one of those individuals there?

A. I'm sure I wouldn't.

On the other hand, the evidence supporting Reed's identity as the party with whom the informant and the undercover agent dealt was clear, and indeed, on the October 10th transaction was irrefutably backed up by a video taken by surveillance agents across the street from the body shop.

Thus, under *Peveto, supra,* there was no showing whatsoever of prejudice to Reed. Accordingly, the district court was well within its discretion in denying Reed's motion for a new trial. We note that Reed does not contend that he had not told the agent he had punched Tucker. Thus, Reed was presumably aware of both the incident with Tucker and the fact he had told the agent about it. Accordingly, he permitted his counsel to cross examine in accordance with this strategy at his peril.

### Reed's Sentence

Finally, Reed asserts that his sentence of 360 months imprisonment was grossly excessive, and that the record was insufficient to support the Guidelines enhancements imposed in four areas: 1) his role as an organizer or leader of the conspiracy; 2) the quantity of drugs attributable to him; 3) the use of a weapon in the drug transaction and 4) his criminal history calculation. Reviewing a District Court's sentence we "accept the findings of fact of the district court unless they are clearly erroneous and give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).

### Reed's Role in the Conspiracy

■ The District Court assessed a four point upward adjustment pursuant to § 3B1.1 of the Sentencing Guidelines based on its finding that Reed was an organizer or leader of a drug operation that involved five or more individuals. The recital of the evidence supporting the conviction, *supra,* fully supports the sentencing judge's conclusion that a drug conspiracy existed, that at least Reed, Woods, Rice, Dilos, Mackey, and Dennis were members of it, and that Reed was its leader. This meets the test of *United States v. Bernaugh,* 969 F.2d 858, 862–63 (10th Cir.1992), where we stated: "The defendant 'must have exercised some degree of

control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.'" *See also, United States v. Rutter,* 897 F.2d 1558, 1563 (10th Cir.1990).

### The Quantity of Drugs Attributable to Reed

 In determining Reed's base offense level for purposes of sentencing the District Court concluded that Reed was responsible for the sale of 216.5 grams. Reed claims that at most only 103 grams can be attributed to him. The Sentencing Guidelines provide that:

> [I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.

> Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level.

U.S.S.G. § 1B1.3, comment. (backg'd); U.S.S.G. § 2D1.1 comment. (n. 12), respectively. In determining the base offense level, the sentencing judge must aggregate the quantity of drugs "'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Ross,* 920 F.2d 1530, 1538 (10th Cir.1990) (quoting U.S.S.G. § 1B1.3(a)(2)). While the government must prove this to the satisfaction of the sentencing judge by a preponderance of the evidence, the defendant need not have been indicted or convicted by the jury for quantities for which he is ultimately held responsible. *See Ross,* 920 F.2d at 1538; *United States v. Rutter,* 897 F.2d 1558 (10th Cir.1990).

Having reviewed the evidence both on the trial and on the sentencing hearing, we conclude that the District Judge was justified in determining that Reed was responsible for transactions totalling 216.5 grams. Only a transaction with Roshawn McFarland requires discussion. While that transaction was not before the jury, McFarland's presence at the body shop at relevant times

during the conspiracy, and the use of her house as a "stash" on a sale by another co-conspirator was the subject of trial testimony. The McFarland transaction itself (for which she was convicted at a separate trial) was, however, put before the sentencing judge at the sentencing hearing, and the District Judge was fully justified in finding that this transaction was conducted by her as a member of the Reed conspiracy, and therefore Reed was chargeable with the cocaine involved in that transaction as well.

### Possession of a Firearm During the Commission of the Offense

 The District Court assessed a two point enhancement for the possession of a firearm during the October 10, 1991 transaction at the Strictly Neat Body Shop. The Sentencing Guidelines state that "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3).

This enhancement was based on the testimony of Agent Bakios at Reed's sentencing hearing. Bakios put before the Court the testimony of Agent Bostic at co-conspirator George Mackey's sentencing hearing. There, Bostic testified that he saw firearms in the waistbands of Reed's co-conspirators and the barrel of a gun sticking out from around a corner in close proximity to the drug sale during the October 10, 1991 transaction at the Strictly Neat Body Shop. The District Court properly concluded that these weapons were connected with the offense, and its two point enhancement for the possession of firearms during the October 10, 1991 drug transaction at the Strictly Neat Body Shop was not error.[6]

### Criminal History

Finally, Reed objects to the addition of nine points to his criminal history calculation, three for a crime committed by Reed as a juvenile, and six for two crimes committed as an adult which Reed claims were related.

---

**6.** While Detective Bostic did not testify at Reed's sentencing hearing, the Court below was entitled to consider that testimony reliable hearsay and

consider it in making its factual findings. *See Rutter,* 897 F.2d at 1563.

With respect to the juvenile conviction, Reed was tried and sentenced as an adult for that crime. Accordingly, the District Court could properly include this in Reed's criminal history calculation.

As to the other two, Reed contends the court committed error by adding three points for each crime because the sentences were served concurrently. The first of these two convictions was for a burglary committed on April 4, 1992, and the second was for the theft of a car on August 17, 1982. Reed was sentenced on November 2, 1982, to 16 months for the burglary, and on November 16, 1982, to 16 months for the car theft, to be served concurrently. The District Court, however, committed no error in finding the crimes unrelated within the meaning of the Sentencing Guidelines and adding three points to Reed's criminal history calculation for each conviction.

Given the foregoing, Reed's sentence of 360 months, with supervised release upon release from prison, was within the guidelines.

Leson Reed's conviction and sentence are accordingly affirmed in all respects.