FILED
United States Court of Appeals
Tenth Circuit

**August 8, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTHONY CARLYLE THOMPSON,

Defendant - Appellant.

No. 15-3313

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 5:13-CR-40060-DDC-10)**

---

Kari S. Schmidt (Tyler J. Emerson with her on the briefs), Conlee Schmidt & Emerson, LLP, Wichita, Kansas, for Appellant.

James A. Brown, Assistant United States Attorney (Thomas E. Beall, United States Attorney, with him on the brief), Office of the United States Attorney, Topeka, Kansas, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **MATHESON** and **MORITZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

# I. Introduction

This appeal arose from a law enforcement investigation into a drug-trafficking operation in the Geary County, Kansas area. Agents gathered evidence by making controlled buys of crack cocaine through a confidential informant; monitoring telephones used by certain of the co-conspirators, including Anthony Carlyle Thompson; and conducting searches of several residences, including Thompson's. Thompson was arrested and charged with one count of conspiracy to distribute more than 280 grams of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a), and multiple counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1).

Before trial, Thompson moved to dismiss the indictment for Speedy Trial Act violations. The district court overruled the motion, finding the court had properly granted an ends-of-justice continuance that tolled the speedy-trial clock. Also before trial, the district court admitted cell-service location information (CSLI) the government obtained without a warrant as part of the process for determining whether certain intercepted phone calls were admissible at trial. In addition, the court denied Thompson's motion to suppress evidence obtained from a search of his residence, finding the search warrant was supported by probable cause.

Thompson was tried along with several co-defendants, including Johnny Lee Ivory, Martye Madkins, and Albert Dewayne Banks, who are appellants in

related appeals. Thompson and his co-defendants were convicted on all counts. Using an extrapolation method of calculation, the presentence investigation report (PSR) attributed 8.477 kilograms of cocaine base to Thompson. The PSR then imposed a four-level leadership sentencing enhancement, which yielded a total offense level of 40, a criminal history category of IV, and a corresponding guidelines range of 360 months to life in prison. Thompson objected to both the drug-quantity calculation and the imposition of the leadership enhancement. At sentencing, the court rejected Thompson's objections, finding he was responsible for 8.477 kilograms of cocaine base and applying the four-level leadership enhancement. The court then sentenced Thompson to 360 months' imprisonment.

Thompson now appeals his convictions and sentence, incorporating by reference some of the arguments made by his co-defendants Madkins, Banks, and Ivory in their related appeals.[1] In particular, Thompson contends the district court erred in (1) denying his motion to dismiss for Speedy Trial Act violations; (2) admitting CSLI obtained without a warrant; (3) denying his motion to suppress evidence obtained from the search of his residence; and (4) delivering a constitutionally deficient reasonable doubt instruction to the jury. Thompson also appeals his sentence, arguing the district court erred in (1) relying on an

---

[1] We consolidated these four appeals for all procedural purposes, including briefing and oral argument. The government thus submitted one consolidated response brief, and we heard oral argument in Thompson's appeal along with consolidated cases 15-3299 (Madkins) and 15-3324 (Banks). Consolidated case 15-3238 (Ivory) was submitted on the briefs.

extrapolation method to calculate the drug quantity attributable to him as relevant conduct; and (2) imposing the four-level leader-organizer enhancement, because the evidence did not establish he served as a leader or organizer in the conspiracy.

For the reasons below, we affirm the district court in full, finding no error in the court's various rulings or in the sentence it imposed.

## II. Analysis

We address Thompson's challenges to his convictions and sentence in turn.

### A. *Speedy Trial Action Violations*

Thompson first argues the district court violated his right to a speedy trial. Pursuant to Federal Rule of Appellate Procedure 28(j), Thompson joins in and adopts by reference the Speedy Trial Act arguments made by his co-defendant Madkins.

In *United States v. Madkins*, No. 15-3299 (10th Cir. 2017), we explain the relevant factual background, which is materially indistinguishable for purposes of Thompson's appeal. Pertinently, Thompson filed a motion to dismiss for Speedy Trial Act violations. It is the district court's denial of that motion that Thompson now appeals.

In *Madkins*, we hold that the district court complied with the requirements of the Speedy Trial Act in granting an ends-of-justice continuance, because the record contains sufficient ends-of-justice findings. For the same reasons, we

-4-

conclude the district court did not violate Thompson's right to a speedy trial. We therefore affirm Thompson's convictions.

### B. Admission of CSLI

Thompson next argues the district court erred in granting the government's application for historical cell-service location information (CSLI) and in admitting that CSLI at a pretrial evidentiary hearing. The Stored Communications Act (SCA), 18 U.S.C. § 2703(d), allows the government to obtain a court order for disclosure of CSLI if it makes a showing of reasonable suspicion. Thompson contends § 2703(d) is unconstitutional, because cell-phone users have a reasonable expectation of privacy in their historical CSLI. And because collecting CSLI constitutes a search, Thompson argues, the Fourth Amendment requires the government to procure a warrant before obtaining a cell-phone user's historical CSLI.

We first explain the relevant background facts and then evaluate Thompson's constitutional arguments. Before trial, the parties engaged in extensive litigation over the admissibility of recorded telephone calls the government had intercepted pursuant to wiretap orders entered by Judge David R. Platt, a state court judge sitting in the Eighth Judicial District of Kansas. Judge Platt had issued wiretap orders for target phones used by Thompson, Banks, and Ivory. Based in part on information derived from intercepts conducted pursuant to the wiretap orders, law enforcement applied for search warrants of various

locations and residences, including Thompson's residence. When law enforcement carried out the search of Thompson's residence, officers seized cell phones, cash, miscellaneous documents, drug paraphernalia, and credit cards.

Thompson filed a motion to suppress the intercepted calls, arguing law enforcement had intercepted his communications outside the territorial jurisdiction of the Eighth Judicial District. Co-defendant Ivory joined the motion. Following a hearing, the federal district court ruled that Kansas law required suppression of evidence about any calls made from a phone that was physically located outside the boundaries of the Eighth Judicial District, since Judge Platt's jurisdiction only extended that far. The court therefore concluded the government could introduce evidence about the wiretapped calls only if it could show that the tapped phones were physically located within the Eighth Judicial District at the time the calls were intercepted. The court postponed its rulings on Thompson's motion to suppress pending the government's coming forth with evidence showing the physical locations of the phones.

The government filed an application for orders pursuant to § 2703(d) of the SCA, asking the court to require the electronic service providers for the target phones—those used by Thompson, Banks, and Ivory—to disclose historical CSLI relating to those phones. Section 2703(d) does not require the government to show probable cause to obtain a court order; rather, the government must simply show there are reasonable grounds to believe the material is relevant to an

ongoing criminal investigation. Thompson filed a response in opposition to the government's application, arguing § 2703(d) is unconstitutional, because a cell-phone user's location is constitutionally protected by the Fourth Amendment. Banks and Ivory joined the motion.

The district court granted the government's application. The court concluded that a cell-phone user has no reasonable expectation of privacy in his CSLI, because CSLI records are business records that fall within the Fourth Amendment's third-party doctrine. Alternatively, the court ruled that even if the Fourth Amendment did apply to CSLI, the government had shown probable cause to support the issuance of the search warrants.

After obtaining the CSLI, the government sought to establish the location of the intercepted phone calls by showing that a call had "pinged" certain cell towers in and around the Junction City area within the Eighth Judicial District. At a pretrial evidentiary hearing, the government presented the CSLI and testimony from two experts who agreed that if the CSLI showed a phone connected to one of the Junction City towers, then it was highly likely the phone was physically located in the Eighth Judicial District. The district court found that this evidence—along with other circumstances, including the fact that many of the defendants' residences and meeting places were located in and around Junction City—established by a preponderance of the evidence that a phone was physically located in the Eighth Judicial District if it had pinged one of the

Junction City towers. Accordingly, the court ruled that if a call had pinged one of those towers, it was admissible. Calls that had not pinged the towers, however, were suppressed.

After the court's ruling, Thompson, Banks, and Ivory filed a second round of suppression motions, seeking to suppress evidence they claimed was obtained derivatively of the suppressed calls and arguing, among other things, that insufficient probable cause remained to support the search warrants once the suppressed calls were excised from the affidavits supporting the warrants. The district court denied the motions. The court found that, even excluding the suppressed calls, the affidavits established probable cause to support issuing the warrants. At trial, the government introduced calls that had pinged on three towers in or immediately surrounding Junction City, along with some of the evidence found during the searches of Banks's and Ivory's residences. The government did not present any evidence found during the search of Thompson's residence. Thompson now appeals the district court's rulings.

\* \* \*

The SCA provides two different routes for the government to obtain historical CSLI. The government may (1) "obtain[] a warrant using the procedures described in the Federal Rules of Criminal Procedure"; or (2) "obtain[] a court order for such disclosure under subsection (d)." 18 U.S.C. § 2703(c)(1). Subsection 2703(d) provides that such a court order "shall issue

-8-

only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

We review de novo Thompson's challenge to the constitutionality of § 2703(d). *See United States v. Yelloweagle*, 643 F.3d 1275, 1279 (10th Cir. 2011). In doing so, our analysis is guided by the Supreme Court's business records cases and the opinions of the four other circuit courts of appeals that have considered this precise question. Those circuits held, as we do today, that cell-phone users lack a reasonable expectation of privacy in their historical CSLI, because they voluntarily convey CSLI to third parties who create records of that information for their own business purposes. In reaching this conclusion, we do not write on a blank slate. Perhaps if we did, we would reach a different conclusion—we wholeheartedly recognize that Thompson raises valid concerns about the application of the third-party doctrine in the digital age. But until the Supreme Court instructs us otherwise, we are bound to follow its third-party doctrine precedents.[2]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[2] The Supreme Court recently granted certiorari in *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), to address whether the Fourth Amendment permits the warrantless seizure and search of historical CSLI.

seizures." U.S. Const. amend. IV. Historically, the Fourth Amendment was understood as guarding primarily against physical governmental trespass upon the areas enumerated in its text. *See United States v. Jones*, 565 U.S. 400, 405 (2012). But since 1967, the Supreme Court has recognized a second, privacy-based approach to the Fourth Amendment as consistent with its original public meaning. *See Katz v. United States*, 389 U.S. 347 (1967). Under that approach, we ask (1) whether the individual asserting an expectation of privacy has "exhibited an actual (subjective) expectation of privacy"; and (2) whether that expectation is "one that society is prepared to recognize as reasonable." *See id.* at 361 (Harlan, J., concurring). Where an expectation of privacy satisfies both of these requirements, government invasion of that legitimate expectation of privacy generally constitutes a search. *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

Relying on *Katz*, Thompson contends cell-phone users have a legitimate expectation of privacy in their historical CSLI, given the ubiquity of cell phones in modern American life and their ability to store and generate large amounts of personal information, including information about a cell-phone user's location.

We are not the first circuit court to confront this issue: four other circuits have already considered and rejected Thompson's position. First, in 2013, the Fifth Circuit held that the government's acquisition of CSLI under § 2703(d) does not constitute a search or seizure subject to the Fourth Amendment's warrant requirement. In *In re Application of the United States for Historical Cell Site*

*Data*, 724 F.3d 600 (5th Cir. 2013), the court explained that historical CSLI "is clearly a business record" created by a third party from information that cell-phone users turn over voluntarily. *Id.* at 611–13. Writing for the majority, Judge Clement explained that "*who* is recording an individual's information initially is key," because when an individual "knowingly exposes his activities to third parties, he surrenders Fourth Amendment protections." *Id.* at 610 (quoting *Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1043 (D.C. Cir. 1978)).

Judge Clement therefore analyzed the constitutionality of § 2703(d) under a pair of Supreme Court cases dealing with business records created by a third party—namely, *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979). The Fourth, Sixth, and Eleventh circuits have since done the same. *See United States v. Graham*, 824 F.3d 421, 426 (4th Cir. 2016) (en banc) ("[T]he question before us is whether the government invades an individual's reasonable expectation of privacy when it obtains, from a third party, the third party's records, which permit the government to deduce location information. . . . [T]he cases that establish the third-party doctrine provide the answer."); *United States v. Carpenter*, 819 F.3d 880, 888–89 (6th Cir. 2016) ("Whether a defendant had a legitimate expectation of privacy in certain information depends in part on what the government did to get it. . . . This case involves business records obtained from a third party . . . .") (citing *Miller*, 425

-11-

U.S. at 443), *cert. granted*, 2017 U.S. App. LEXIS 3686 (U.S. 2017) ; *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (en banc) ("[L]ike the bank customer in *Miller* and the phone customer in *Smith*, Davis has no subjective or objective reasonable expectation of privacy in MetroPCS's business records showing the cell tower locations that wirelessly connected his calls. . . .").

These circuit decisions also generated thoughtful dissents. In *United States v. Davis*, for example, Judge Martin dissented from the en banc majority opinion, because she would have distinguished CSLI from the conventional telephone and bank records in *Smith* and *Miller* and therefore would have held § 2703(d) unconstitutional. Judge Martin warned of the potential consequences of the majority's holding in an era of rapid technological change, stating "the majority's blunt application of the third-party doctrine threatens to allow the government access to a staggering amount of information that surely must be protected under the Fourth Amendment," such as a person's web-search history. *See Davis*, 785 F.3d at 535–36 (Martin, J., dissenting). And because she would not have decided the issue under the third-party doctrine, Judge Martin explained that in today's digital world, she believes cell-phone users have a legitimate, reasonable expectation of privacy that their location information will be kept private. *Id.* at 539.

Similarly, in *United States v. Graham*, Judge Wynn dissented in part from the opinion of the court, because he believed cell-phone users do not voluntarily

convey their CSLI. Judge Wynn explained his view that voluntary conveyance has two components: "knowledge of particular information and an action submitting that information." *Graham*, 824 F.3d at 443 (Wynn, J., dissenting). Unlike the majority, Judge Wynn found "no reason to think that a cell phone user is aware of his CSLI, or that he is conveying it." *Id.* at 445. He also pointed out that CSLI can be automatically generated even when a user *receives* a call. *Id.* In the absence of voluntary conveyance, then, Judge Wynn would have continued to the Fourth Amendment reasonableness inquiry and held the government violates reasonable expectations of privacy when it obtains CSLI without a warrant. And like Judge Martin, Judge Wynn also highlighted his concerns about the application of the third-party doctrine to new technology, given heightened privacy interests and the potential for government overreach.

Although these dissents raise some valid points, we agree with the majority opinions that *Miller* and *Smith* provide the applicable framework for considering whether § 2703(d) violates the Fourth Amendment. In *Miller*, the question before the Supreme Court was whether the defendant had a reasonable expectation of privacy in subpoenaed copies of his checks and other bank records maintained in accordance with the Bank Secrecy Act. 425 U.S. at 437. The Court held the defendant did not have a legitimate expectation of privacy in the subpoenaed records, reasoning the defendant could "assert neither ownership nor possession" of the documents; instead, the records were "the business records of the banks"

and related to transactions to which the banks were a party. *Id.* at 440–41. The Court explained the bank records were "not confidential communications," but rather "contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442. And the Court reiterated it had repeatedly held that the Fourth Amendment does not forbid "the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.* at 443.

Several years later, in *Smith*, the Court held the third-party doctrine applied to the warrantless installation of a pen register used to record telephone numbers dialed from the defendant's home. 442 U.S. at 743–46. Applying the reasonableness test from *Katz*, the Court rejected the defendant's claim that he had a legitimate expectation of privacy in the phone numbers dialed on his home telephone. *Id.* at 742. In doing so, the Court distinguished the device used in *Katz*, where the government had listened to the *contents* of a phone conversation, from the pen register at issue in *Miller*, which recorded only the *numbers* dialed from the phone. *Id.* at 741. And, the Court reasoned, telephone users "typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate

-14-

business purposes." *Id.* at 743. Because the defendant voluntarily turned over his numerical information to a third-party phone company, he lacked a legitimate expectation of privacy in that information. *Id.* at 743–44.

So too here. To begin, fundamentally it is not the *government* who is initially gathering users' historical CSLI, but rather third-party service providers who create records for their own business purposes. This distinction matters a great deal, as the Supreme Court has repeatedly emphasized in its third-party cases. *See Miller*, 425 U.S. at 443 (listing cases). The Fourth Amendment is a bulwark against government action. And indeed, every other circuit has likewise focused on *who* is collecting CSLI in the first instance. For example, in *Carpenter*, Judge Kethledge wrote, "[w]hether a defendant had a legitimate expectation of privacy in certain information depends in part on what the government did to get it. . . . This case involves business records obtained from a third party, which can only diminish the defendants' expectation of privacy in the information those records contain." 819 F.3d at 888; *see also Davis*, 785 F.3d at 514 ("MetroPCS, not the government, built and controlled the electronic mechanism (the cell towers) and collected its cell tower data for legitimate business purposes.").

Furthermore, under the same rationale the Court articulated in *Miller* and *Smith*, cell-phone users voluntarily turn over their CSLI to service providers, thus relinquishing any reasonable expectation of privacy. In *Miller*, the Court stated,

-15-

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government . . . ." 425 U.S. at 443. And in *Smith*, the Court explained that when the defendant used his phone, he "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business," thus "assum[ing] the risk that the company would reveal to police the numbers he dialed." 442 U.S. at 744. The Court also noted that "[t]he fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number" had no bearing on the constitutional question. *Id.* at 745.

Applying this reasoning here, we agree with the other circuits that "any cellphone user who has seen her phone's strength fluctuate must know that, when she places or receives a call, her phone 'exposes' its location to the nearest cell tower and thus to the company that operates the tower." *See Carpenter*, 819 F.3d at 888 (first citing *Davis*, 785 F.3d at 511; then citing *In re Application for Historical Cell Site Data*, 724 F.3d at 614). And we agree with the Fifth Circuit that, "[e]ven if this cell phone-to-tower transmission was not 'common knowledge' . . . cell phone service providers' and subscribers' contractual terms of service and providers' privacy policies expressly state that a provider uses a subscriber's location information to route his cell phone calls." *Id.* at 613. These documents also "inform subscribers that the providers not only use the

information, but collect it" and "will turn over these records to government officials if served with a court order." *Id.* In fact, such disclaimers go above and beyond what the Constitution requires: *Smith* tells us users' knowledge that business records are being created does not "make any constitutional difference." 442 U.S. at 745.

Nevertheless, Thompson contends the third-party doctrine has no application here, because that doctrine presumes a voluntary relinquishment of information. And since a cell phone's transmission of location information is "automatic and surreptitious," Thompson argues, and providers gather and retain location information whenever calls, text messages, or data are sent *or* received, individuals do not voluntarily disclose their CSLI to service providers. We disagree. Cell-phone users voluntarily enter arrangements with service providers knowing they "must maintain proximity to the provider's cell towers" in order for their phones to function. *Graham*, 824 F.3d at 430; *see also Davis*, 785 F.3d at 520 (Pryor, J., concurring) ("[C]ell phone users realize that their calls are routed through nearby cell towers. It is no state secret that cell phones work less effectively in remote areas without cell towers nearby.").

Finally, we emphasize that like the phone numbers recorded by the pen register in *Smith*, CSLI is not a record of conversations between individuals, but rather a record of the transmission of data that occurs to facilitate those conversations. As Judge Kethledge explained in *Carpenter*, "federal courts have

long recognized a core distinction" between the *content* of personal communications and the information necessary to *convey* that content. 819 F.3d at 887. In other words, "although the content of personal communications is private, the information necessary to get those communications from point A to point B is not." *Id.* Thus, like the numerical information in *Smith*, CSLI is not protected by the Fourth Amendment, because it functions merely "as a means of establishing communication." *See* 442 U.S. at 741.

In reaching our holding today, we recognize the difficulties inherent in applying longstanding precedent to new technology, which has progressed at an exponential pace in the four decades since *Miller* and *Smith* were decided. We are acutely aware of the privacy concerns accompanying technological advancement, particularly in our society, where using a cell phone has become a near necessity in the modern American economy. And we acknowledge that distinguishing between the content of communication and the means of transmission may be more difficult for other types of data, such as web-browsing history. But today we focus on the narrow question before us: whether Thompson has a reasonable expectation of privacy in his historical CSLI. And for the reasons above, we hold he does not.

Thompson relies on the Supreme Court's decision in *United States v. Jones* to argue that societal expectations of privacy have changed.[3] He points to Justice Sotomayor's concurrence, where she opined, "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties," characterizing this approach as "ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." *Jones*, 565 U.S. at 417 (Sotomayor, J., concurring). This may well be true. But Justice Sotomayor's concurrence was not the opinion of the Court. And in any event, she merely called into question the *future* of the third-party doctrine. Until

    [3] As part of his Fourth Amendment argument, then, Thompson contends cell-phone users have a reasonable expectation of privacy in their CSLI because societal expectations of privacy have changed in light of technological advances. The government believes Thompson has waived this argument by failing to raise it below. But in his objection to the government's application for § 2703(d) orders, Thompson argued that "a phone user's location is constitutionally protected by the Fourth Amendment," citing for support the Eleventh Circuit's panel opinion in *United States v. Davis*, 754 F.3d 1205 (2014), *overruled in part by United States v. Davis*, 785 F.3d 498 (2015) (en banc). After reviewing the record, we conclude Thompson adequately preserved his arguments for appeal.

    Our conclusion is bolstered by the district court's discussion of the Fourth Amendment issue in its order granting the government's application. In rejecting Thompson's arguments, the court decided not to follow *Davis*. Instead, the court relied on the Fifth Circuit's decision in *In re Application for Historical Cell Cite Data*, where the court held cell-phone users lack a reasonable expectation of privacy in their CSLI, because users voluntarily convey that information to third parties. The court's thorough discussion of reasonable expectations of privacy in CSLI further indicates Thompson sufficiently preserved his Fourth Amendment arguments for our review.

a majority of justices on the Court instructs us otherwise, we are still bound by the third-party doctrine as it exists today.

Ultimately, *Jones* tells us very little that is relevant here, since its holding did not rely on a privacy theory of the Fourth Amendment. Instead, five justices agreed the government's installation of a GPS device on the defendant's vehicle after the search warrant had expired constituted a physical trespass contrary to the Fourth Amendment. Writing for the majority, Justice Scalia explained the government's installation and use of a GPS device surely "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404–05. Justice Scalia expressly stated "the present case" did not require the court to consider whether electronic surveillance of the defendant, "without an accompanying trespass," would be "an unconstitutional invasion of privacy." *Id.* at 412.

To be sure, like Justice Sotomayor and the dissenting judges in other circuit-level CSLI cases, Thompson raises valid concerns about the third-party doctrine in the digital age. The aggregation of an individual's location data can tell the government a great deal about that person. As Justice Sotomayor stated in *Jones*, "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." 565 U.S. at 415 (Sotomayor, J., concurring). The same could be said about a person's web-browsing history.

And we, too, fear the Orwellian-style surveillance state that could emerge from unfettered government collection of personal data.

At this point, however, we can only speculate how the Supreme Court will address these concerns, now that it has taken up the question of historical CSLI by granting certiorari in *Carpenter*. Perhaps the Supreme Court will revisit the third-party doctrine in light of evolving technology, especially given the ubiquity of cell phones in Americans' lives, possible changing societal expectations of privacy, and their implications on the national economy. And in fact, in *Riley v. California*, 134 S. Ct. 2473 (2014), Chief Justice Roberts famously recognized that modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at 2484. The Chief Justice went on to distinguish cell phones from the types of physical objects in earlier cases involving the search incident to arrest doctrine, citing rapid technological change and heightened privacy interests, since cell phones store "vast quantities of personal information" and raise unique concerns about government overreach. *Id.* at 2484–85. The Court may well draw on these types of cell-phone-specific concerns to expressly limit the reach of the third-party doctrine to business records created from the use of conventional telephones or bank statements. If the Court were to hold that cell-phone users enjoy a reasonable expectation of privacy in their historical

CSLI, then law enforcement would simply be required to obtain a warrant supported by probable cause pursuant to § 2703(c)(1)(A) of the SCA.

But again, today our analysis of the narrow issue of historical CSLI is governed by the third-party doctrine as it currently exists. In the meantime, we believe privacy concerns about historical CSLI are best directed to legislative bodies, which are better equipped to evaluate the types of empirical studies and policy arguments Thompson presents and weigh the interests on both sides. And indeed, at least six states—Colorado, Maine, Minnesota, Montana, Tennessee, and Utah—have legislated privacy protections for CSLI. *See* Colo. Rev. Stat. Ann. § 16-3-303.5(2) (West 2014); Me. Rev. Stat. Ann. tit. 16, § 648 (West 2014); Minn. Stat. Ann. §§ 626A.28(3)(d), 626A.42(2) (West 2014); Mont. Code Ann. § 46-5-110(1)(a) (West 2013); Tenn. Code Ann. § 39-13-610(b) (West 2014); Utah Code Ann. § 77-23c-102(1)(a) (West 2016). These state statutes generally require law enforcement to procure a warrant before obtaining CSLI, with most allowing for certain exceptions such as exigent circumstances or other exceptions to the warrant requirement.

So for now, at least, as Judge Clement advised in *In re Application for Historical Cell Site Data*, the recourse for cell-phone users' desire for their historical CSLI to remain private "is in the market or the political process: in demanding that service providers do away with such records (or anonymize them) or in lobbying elected representatives to enact statutory protections. The Fourth

Amendment, safeguarded by the courts, protects only *reasonable* expectations of privacy." 724 F.3d at 615 (emphasis added).

In sum, we hold that cell-phone users lack a reasonable expectation of privacy in their historical CSLI, which users voluntarily convey to third-party cell-service providers. Therefore, the district court did not err in granting the government's application for orders requesting historical CSLI under § 2703(d) or in admitting some of that CSLI at a pretrial proceeding.[4]

## C. Denial of Motion to Suppress

Thompson next contends the district court erred in denying his motion to suppress evidence obtained from a search of his residence, because there was insufficient probable cause to support the search warrant after any suppressed calls were excised from the affidavits.[5] But Thompson conceded at oral argument that the CSLI issue is a "lynchpin" for him: if the CSLI was properly admitted, then so were the calls that pinged the three towers in the Junction City area. Having concluded the CSLI was properly obtained and admitted, the affidavits supporting the application for a warrant to search Thompson's residence sufficiently alleged probable cause.

---

[4] In so holding, we also reject Thompson's alternative argument that obtaining CSLI requires a Title III wiretap warrant. Although the government certainly *could have* chosen to apply for a Title III warrant, it was not required to.

[5] We reject Thompson's suppression arguments on the merits. But in any event, none of the evidence Thompson challenges was admitted at trial.

We also reject Thompson's contention that the district court should not have admitted *any* of the intercepted calls at trial, because the court erred in requiring the government to prove the phones were in Kansas's Eighth Judicial District by a preponderance of the evidence, rather than clear and convincing evidence. This argument lacks merit. For one thing, Thompson fails to cite any authority for this proposition. And for another, this court has applied a preponderance standard in reviewing the sufficiency of the evidence on venue in a criminal case—an element of every crime which has constitutional underpinnings. *See United States v. Kelly*, 535 F.3d 1229, 1233 (10th Cir. 2008); *cf. United States v. Bowers*, 660 F.2d 527, 531 (5th Cir. 1981). If a preponderance is the proper standard for determinations of venue in criminal cases, then surely the same standard applies to the jurisdictional question that was at issue here.

Even if the court erred in analogizing to venue in criminal cases—and we do not believe it did—the Supreme Court has stated, "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The use of the preponderance standard in the Fourth Amendment context therefore also suggests the same standard applies for questions of jurisdictional fact involving a wiretap order. And under a preponderance standard, the government clearly met its burden of proving the calls from the target phones were made in the Eighth Judicial District.

-24-

Accordingly, we hold the district court did not err in denying Thompson's motion to suppress evidence obtained from a search of his residence.

### D.  Reasonable Doubt Instruction

Thompson next contends the district court's reasonable doubt instruction was constitutionally deficient.  Pursuant to Federal Rule of Appellate Procedure 28(j), Thompson joins in and adopts by reference the arguments raised by his co-defendant Ivory.

The factual background is the same as that described in *United States v. Ivory*, No. 15-3238 (10th Cir. 2017).  And like Ivory, Thompson cannot meet his burden of establishing plain error.  As we explain in *Ivory*, our recent decision in *United States v. Petty*, 856 F.3d 1306 (10th Cir. 2017)*,* forecloses any possibility of error here.  In *Petty*, we reviewed de novo the constitutionality of a materially identical reasonable doubt instruction and squarely rejected the precise challenges Ivory and Thompson now assert on appeal.

For the same reasons articulated in *Ivory*, we discern no error in the court's reasonable doubt instruction and affirm Thompson's convictions.

### E.  Challenges to Thompson's Sentence

Finally, Thompson challenges his sentence in two ways, arguing the court erred in (1) relying on an extrapolation method to calculate the drug quantity attributable to him as relevant conduct; and (2) imposing a four-level leadership

enhancement without sufficient evidentiary support. We first explain the relevant background information and then consider Thompson's arguments in turn.

Before sentencing, the probation officer prepared the PSR. To calculate the quantity of drugs attributable to Thompson, the PSR extrapolated from two sources: (1) a recorded encounter between Thompson and a confidential informant in which Thompson said he was purchasing approximately nine ounces of cocaine every week; and (2) a telephone call in which Thompson purchased approximately five ounces of powder cocaine from one of his suppliers. Using these amounts, the PSR attributed seven ounces of powder cocaine (the midpoint between five and nine) to Thompson and multiplied by forty-eight weeks, the amount of time Thompson was involved in the conspiracy. The PSR converted that amount to cocaine base, which yielded a total of 8.477 kilograms and a corresponding base offense level of 36. The PSR then applied a four-level enhancement for being a leader or organizer of a criminal activity involving five or more participants to reach a total offense level of 40, a criminal history category of IV, and a corresponding advisory guidelines range of 360 months to life in prison. Thompson objected to both the drug-quantity calculation and the leadership enhancement.

At sentencing, the court rejected Thompson's objections, finding the extrapolation method was reliable and attributing 8.477 kilograms of cocaine base to Thompson. The court also found the factors in the application note to the

-26-

leadership enhancement guideline supported applying the enhancement. The court acknowledged that one factor—how the co-conspirators distributed the proceeds of the conspiracy—was ambiguous, but it stated the other factors clearly supported a finding that Thompson served in a leader or organizer role. Accordingly, the court imposed the four-level enhancement, which yielded a guidelines range of 360 months to life in prison. The court sentenced Thompson to 360 months in prison.

### 1. *Extrapolation Method for Drug-Quantity Calculation*

Thompson first argues the district court erred in relying on the extrapolation method in the PSR, which attributed 8.477 kilograms of crack cocaine to Thompson as relevant conduct.

We review for clear error a district court's determination of the drug quantity attributable to a defendant, including the scope of jointly undertaken criminal activity. *United States v. Sells*, 541 F.3d 1227, 1235 (10th Cir. 2008). We will reverse a drug-quantity finding "only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Ryan*, 236 F.3d 1268, 1273 (10th Cir. 2001).

In conspiracy cases, the Guidelines require a district court to make particularized findings regarding both jointly undertaken criminal activity and the reasonably foreseeable acts of others in connection with that criminal activity

before determining the drug quantity attributable to a defendant. *See* USSG

§ 1B1.3. Extrapolation can be a permissible method of calculating that quantity.

We have previously recognized that "when the actual drugs . . . are not seized, the

trial court may rely upon an estimate to establish the defendant's guideline

offense level so long as the information relied upon has some basis of support in

the facts of the particular case and bears sufficient indicia of reliability." *United*

*States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (quotation marks omitted).

But we have cautioned, "the 'need to estimate drug quantities at times is not a

license to calculate drug quantities by guesswork.'" *Id.* (quoting *United States v.*

*Richards*, 27 F.3d 465, 469 (10th Cir. 1994)). Thus, in considering whether a

drug-quantity estimation is clearly erroneous, we look for other corroborating

evidence to determine whether the estimation has sufficient factual support. *See*

*Dalton*, 409 F.3d at 1251.

Thompson makes several challenges to the district court's drug-quantity

calculation. None has merit. First, Thompson claims the court clearly erred in

crediting expert testimony that interpreted a recorded conversation between

Thompson and a confidential informant. When asked how much cocaine he was

distributing, Thompson responded, "'bout a nine. I ain't trying to do too much."

Aplt. Br. at 37. A Kansas Bureau of Investigation Agent testified that this meant

when Thompson received crack cocaine from his suppliers, he received

approximately nine ounces of it each time. The expert's interpretation is a

plausible basis for extrapolating from the nine-ounce amount as part of the drug-quantity calculation. At sentencing the district court referenced other portions of the PSR which described numerous instances of Thompson selling various amounts of cocaine. Viewing the record as a whole, then, the court's decision to credit this expert testimony for the nine-ounce quantity was not clearly erroneous.

Thompson next challenges the PSR's reference to intercepted phone calls in which Thompson discussed purchasing five ounces of powder cocaine from a co-defendant, Steven Clark. At sentencing, Thompson objected to the district court's consideration of the call, because both sides agreed it was a suppressed call. The court overruled the objection, finding there was an alternative source of the information: Clark gave the government the same information through proffer statements and as part of the factual basis for his guilty plea. Thompson now argues for the first time that the proffer statement was not a true alternative source, because the suppressed call started a chain of events that led to Clark's proffer statement, which in turn was tainted fruit. But Thompson has waived this argument by failing to argue for plain error, "surely mark[ing] the end of the road for an argument for reversal not first presented to the district court." *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

Finally, Thompson argues the district court clearly erred by not attributing 200.48 grams to him—an amount that excludes the quantities extrapolated from the conversation with the confidential informant and the Clark phone call/proffer

-29-

statement.  But as the district court recognized at sentencing, "one of the problems with relevant conduct findings in this context is drug traffickers don't keep good records.  There are not inventory records on when we got this and when it went out, that sort of thing."  R., Vol. VII at 4307.  The court thus decided to credit the extrapolation in paragraph 119 of the PSR, finding it was sufficiently supported by other reliable evidence in the record.  We agree.  If anything, the figure derived from the extrapolation was likely a conservative estimate, given the numerous other drug transactions Thompson was involved in.

In sum, finding no clear error in the district court's drug-quantity findings, we affirm Thompson's sentence.

### 2. *Four-Level Leadership Enhancement*

Thompson next contends the court erred in imposing the four-level leadership sentencing enhancement, because there was not sufficient evidence in the record to support the court's finding that Thompson was a leader or organizer of the conspiracy for purposes of the enhancement.

We review challenges to the imposition of guidelines enhancements for clear error as to findings of fact and de novo as to questions of law.  *United States v. Irvin*, 682 F.3d 1254, 1276–77 (10th Cir. 2012).  In doing so, we give "due deference to the district court's application of the guidelines to the facts."  *United States v. Reed*, 1 F.3d 1105, 1110 (10th Cir. 1993) (quoting 18 U.S.C. § 3742(e)).

Section 3B1.1(a) of the Guidelines provides for a four-level increase in a defendant's total offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The application notes explain,

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG § 3B1.1 cmt. n.4.

We have previously stated, "[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals, because § 3B1.1(a) 'is an enhancement for organizers or leaders, not for important or essential figures.'" *United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir. 1995) (quoting *United States v. Roberts*, 14 F.3d 502, 523 (10th Cir. 1993)). And we have clarified, "[t]his is not a particularly onerous showing: 'The Guideline requires only a conclusion that the defendant supervised at least one such participant; it does not require the court to identify specific examples.'" *United States v. Gallant*, 537 F.3d 1202, 1241 (10th Cir. 2008) (quoting *United States v. Aptt*, 354 F.3d 1269, 1287 (10th Cir. 2004)).

Here, Thompson argues the district court clearly erred because the record is completely devoid of evidence to support the application of the enhancement. But Thompson mischaracterizes the record, which is replete with instances of Thompson recruiting and directing other members of the conspiracy. For example, the PSR recounts how Thompson recruited co-conspirator Charles Foster as a customer and then began using him to facilitate drug transactions with third persons. And the PSR provides specific examples of Foster and another co-conspirator, Patricia Foy, completing drug transactions on Thompson's behalf. Both Foster and Foy acknowledged serving as middlemen for Thompson in Mirandized, videotaped statements made upon their arrests. Likewise, the PSR details how co-conspirator Barbara Shaw served as a distributor for Thompson. Intercepted phone calls and text messages showed Shaw had repeatedly contacted Thompson requesting crack cocaine for herself and others.

On this record, we cannot agree with Thompson that the district court clearly erred in applying the four-level leadership enhancement. Accordingly, we affirm Thompson's sentence.

## III. Conclusion

For the foregoing reasons, we AFFIRM Thompson's convictions and sentence.